IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RODELL THOMPSON,

                     Petitioner,                     OPINION AND ORDER

     v.                                            17-cv-805-wmc

RANDALL HEPP[1], Warden,
Waupun Correctional Institution,

                     Respondent.

---

Rodell Thompson, an inmate at the Waupun Correctional Institution, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his April 2014 conviction in La Crosse County Case No. 13CF679 for sexual assault, battery, and false imprisonment. Thompson asserts that his resulting confinement is in violation of his Sixth Amendment right to counsel. For the reasons stated below, the court finds his claims to be without merit and will deny his petition.

FACTS[2]

In early October 2013, the State charged Thompson in the Circuit Court for La Crosse County with second-degree sexual assault, false imprisonment, and misdemeanor

---

[1] The current warden of the Waupun Correctional Institution, Randall Hepp, is substituted for Brian Foster as the proper respondent in this action. *See* Rule 2(a) of the Rules Governing Section 2254 Cases (proper respondent is state officer who has custody over petitioner).

[2] These facts are drawn from the Wisconsin Court of Appeals' decision on Thompson's direct appeal, *State v. Thompson*, 2016 WI App 75, 371 Wis. 2d 760, 886 N.W.2d 593 (unpublished disposition), and the record before this court. Additional facts are discussed below where relevant.

battery, as a repeat offender.   The charges arose from an alleged incident occurring in the overnight hours of September 16-17, 2013, and involving a woman referred to as "S.S." Thompson went to trial and was convicted by a jury of all three counts.

The trial evidence showed that S.S. had been drinking at a tavern in downtown La Crosse with her "off-again, on-again" boyfriend on the evening of September 16, prompting an argument over her drinking.   Kicked out of the tavern and outside alone, S.S. asked several people if she could use their cell phones in an attempt to call her daughter for a ride.   As she was doing so, defendant Thompson approached.   S.S. and Thompson gave very different accounts about what happened next.   S.S. testified that she asked Thompson if she could use his phone to call her daughter, and Thompson told her that she could, but that his phone was back at his house, which was "just down the street."   S.S. told the jury the two then walked several blocks to a house that Thompson said he was remodeling, went down to the basement, and sat on a couch.   At that point, S.S. testified that Thompson detained her (even forcing her to urinate on the basement floor), and he forcibly had sexual intercourse with her.   S.S. further testified that Thompson struck her on the head, causing neck pain that persisted.   According to S.S., Thompson had no phone, and she eventually left the residence with him.   Eventually, Thompson walked away, and S.S. spoke with some young men, who let her use a phone after she asked them for help.   The next day, she went to the hospital for a sexual assault examination, where she provided her account to a nurse.

On the other hand, Thompson testified that his encounter with S.S. was entirely consensual.   Specifically, Thompson testified that he first encountered S.S. sitting in front

of the tavern, where he engaged her in conversation.   According to Thompson, S.S. told him that "[s]he ran off with $265 of her boyfriend's money," and she "wanted some meth." Thompson said he offered her the money to repay her boyfriend, and they then walked to a house that he was helping to remodel, which was also where he apparently planned to sleep that night. Thompson also testified that S.S. used a bathroom on the first floor before going down to the basement, and although not specifically denying that he forced her to urinate on the basement floor, he denied restraining her and indicated that she was free to use the first-floor bathroom.

Thompson directly denied wanting to have sex with S.S.   Rather, he asserted that S.S. initiated sex by kissing him and rubbing him under his shirt.   After having consensual sexual intercourse, Thompson contended that they talked about the money S.S. owed her boyfriend, and Thompson made a plan with S.S. to meet the next day, when he would give her the money.   Thompson also testified that they left the house together, then hugged before he returned to the house.   According to Thompson, he showed up the next day to give S.S. the money, but she never did.

Over Thompson's objection, the trial court allowed the State to introduce "other acts" evidence relating to an alleged, prior victim referred to as "J.K.," to prove that Thompson intended to confine S.S. without her consent.   At trial, with Thompson's consent, the State then introduced this evidence by way of a stipulation, which advised the jury that she would have testified as follows:

> • On July 10, 2012, just two months before the attack charged in this case, J.K. was approached by Thompson when she was walking near the same tavern where Thompson encountered S.S.

• Thompson asked J.K. if she wanted to smoke marijuana at his place.

• J.K. agreed, and they walked to a nearby house.

• The house was "abandoned," and they entered a "back room."

• J.K. told Thompson that she was going to leave if they did not smoke marijuana.

• Thompson "got on top of her," and they "struggled on the ground."

• Thompson put his hands over her mouth and told her not to scream.

• They continued to struggle, but J.K. was able to get Thompson "off of her."

• Thompson "blocked the door and would not allow [J.K.] to leave."

• J.K. "was finally able to break free from [Thompson] and took off running out of the house."

In addition to this evidence, the jury heard from the sexual assault nurse examiner ("SANE") who examined S.S. on September 17, 2013, and photographed her injuries, which included bruising on her arms, wrist, chest, and thigh. The nurse examiner also testified that S.S.'s injuries were consistent with her account of the events on the night of the 16th. Also testifying was one of the young men that S.S. asked for help after her encounter with Thompson, who described S.S. as disoriented and "not all there" when he spoke with her.

During his direct testimony, Thompson admitted that he liked to go to the bar where he met S.S., because he would "usually go there to drink or to meet up with a . . . woman or something," and there "would be a lot of . . . womens [sic] there." (Tr. of Jury Trial, Day 2 (dkt. # 22-21) 59-60:22-5.) With respect to the accusations by J.K.,

Thompson also admitted that he met her within three blocks of the bar where he encountered S.S., but testified that J.K. took him to a house, asked him to go "find some weed" for her, and when he got back, she was gone.   (*Id*. 59:1-3; 78:20-25; 80: 1-3; 84:5.) Thompson expressly denied holding J.K. down against her will.   (*Id*. 58:17-18.)

The jury convicted Thompson on all three charges.   The trial court subsequently imposed a sentence of 25 years initial confinement to be followed by 15 years extended supervision.

After sentencing, Thompson filed a postconviction motion alleging that his trial counsel had been ineffective by failing:   (1) to elicit testimony about the absence of physical evidence of urine at the scene; (2) to impeach the stipulated testimony of J.K. with evidence that she had three convictions; and (3) to include with a pretrial motion for *in camera* review, S.S.'s mental health records information indicating that persons with borderline personality disorder may suffer from hallucinations and unstable relationships. After a hearing at which Thompson's trial counsel testified, the court denied his motion, finding both that trial counsel's performance had not been deficient and that Thompson had not been prejudiced.

Thompson pursued appeal of his conviction and the denial of his postconviction motion to the Wisconsin Court of Appeals, reasserting his claims of ineffective assistance of counsel for (1) failing to elicit testimony about the absence of physical evidence of urine at the scene and (2) his handling of the pretrial motion pertaining to the victim's mental health records, but abandoned his claim with respect to impeaching J.K.'s testimony with evidence of her prior convictions.   In addition to his ineffective assistance of counsel

claims, Thompson also argued that the trial court had erroneously exercised its discretion in admitting the other acts evidence concerning Thompson's assault of J.K.

The Wisconsin Court of Appeals rejected all three of Thompson's arguments and affirmed his conviction.   In analyzing Thompson's ineffective assistance claims under the two-part framework of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), in particular, the court of appeals found that Thompson had failed to demonstrate that he was prejudiced by either of counsel's alleged errors.

Thompson next filed a petition for review with the Wisconsin Supreme Court, raising only two grounds:   (1) the trial court erred in allowing the jury to hear the other acts evidence about J.K.; and (2) counsel was ineffective in failing to present evidence regarding the lack of urine residue on the floor.   The Wisconsin Supreme Court denied the petition.

OPINION

In his habeas petition, Thompson reasserts the three claims of ineffective assistance of counsel raised in his state court postconviction motion.   Specifically, he argues that trial counsel was ineffective in failing: (1) "to adequately address S.S.'s claim that Thompson forced her to urinate on the basement floor"; (2) to impeach J.K.'s testimony with evidence of her three convictions by stipulation; and (3) to adequately support the pretrial motion for *in camera* review of S.S.'s mental health records.   To succeed on the merits on any of these claims, Thompson must satisfy the two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984), by establishing that:   counsel's performance fell below an objective standard

of reasonableness; and but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different.   *Id*. at 694.

Before a *federal* court can even consider the merits of a collateral attack on a state conviction, however, the state courts must have adjudicated that claim on the merits, and the petitioner must have exhausted all rights to appeal.   Otherwise, he will be deemed to have "procedurally defaulted" any right to federal court relief.   *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (petitioner's failure to exhaust his state court remedies, where such remedies are no longer available, constitutes a "procedural default" that bars the federal court from hearing his claims).   Generally, a federal court can overlook a procedural default if the petitioner can show either (1) cause for his default and resulting prejudice or (2) that a failure to grant him relief would work a fundamental miscarriage of justice.   *Steward v. Gilmore*, 80 F.3d 1205, 1211-12 (7th Cir. 1996).   Moreover, even when a collateral attack is properly before a federal court, its review is still circumscribed by 28 U.S.C. § 2254(d).   Under that statute, this court may grant Thompson's petition *only* if the state courts' adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Consistent with this standard, federal courts may not review state court decisions adjudicating federal constitutional claims *de novo*, but rather may review only for

reasonableness.   Moreover, for purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."   *Williams v. Taylor*, 529 U.S. 362, 410 (2000) (O'Connor, J., concurring).   To show that a state court decision was unreasonable, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."   *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Under § 2254(d)(2), a federal court may grant habeas relief on the alternative ground that the state court's adjudication of a constitutional claim was based upon an unreasonable determination of the facts in light of the evidence presented.   Again, however, the federal court owes deference to the state court.   The underlying state court findings of fact and credibility determinations against the petitioner are presumed correct unless the petitioner comes forth with clear and convincing evidence to the contrary.   28 U.S.C. § 2254(e)(1); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014); *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013).

Where, as here, the prisoner asserts a claim of ineffective assistance of counsel, this standard of review is extraordinarily difficult to meet:   "The standards created by [*Strickland*] and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."   *Id*. at 105 (internal quotations and citations omitted).   This means that if "there is any reasonable argument" that *Strickland*'s deferential standard has been met, then habeas relief is not available.   *Id*.   Under this highly deferential standard,

Thompson is unsurprisingly entitled to no relief on any of his three claims for ineffective assistance of counsel.

## I.    Failure to Pursue Evidence Challenging S.S.'s Testimony About Thompson Forcing Her to Urinate on the Floor

As for his first claim, Thompson argues that his trial counsel could have cast doubt on S.S.'s testimony that she was forced to urinate in the basement, which he contends would have impeached her broader assertion that she was held against her will. Specifically, he faults his counsel for not:  (1) pointing out the state's failure at trial to present evidence of urine or urine odors at the crime scene; and (2) cross-examining a detective who entered the residence as part of her investigation and spoke to the landlord, yet admitted at the preliminary hearing that no one said anything about urine, and she neither noticed the smell of urine nor observed urine residue.   As the Wisconsin Court of Appeals reasonably concluded, however, Thompson cannot show a reasonable probability that the result of the proceedings would have been different even if counsel *had* attempted to emphasize the absence of proof of urine or impeach the detective for failing to investigate adequately.   As the court of appeals observed:   (1) the fact that the detective did not smell urine or notice its residue when she went to the residence some nine days after the alleged assault could be easily explained by Thompson having cleaned the floor after S.S. left; (2) the landlord could have cleaned it up without necessarily knowing it was urine or its importance to the investigation; (3) the detective did not actually testify at the preliminary hearing that she did *not* smell urine, but rather that she could not tell whether it was urine

because of other "distinct odors" in the house; and (4) whether urine would leave residue and a discernible stench after nine days in a basement filled with other odors was beyond the scope of common knowledge.   For all these reasons, the Wisconsin Court of Appeals held that:

> [T]he record before us reveals very little about this urine situation. Postconviction counsel did not try to fill in any blanks at the postconviction hearing, and it is entirely possible that any such effort would have led nowhere. At best, from Thompson's point of view, what we do have suggests that police did not think to pursue evidence supporting S.S.'s urination assertion or that, if they did, they did not uncover any significant evidence. Either way, for the reasons we have discussed, the failure of Thompson's counsel to pursue the avenues now suggested by Thompson does not undermine our confidence in the verdicts. That is, even assuming, without deciding, deficient performance, Thompson fails to demonstrate prejudice.

*State v. Thompson*, 2016 WI App 75, ¶ 31.

When "[t]he state court takes the rule seriously and produces an answer within the range of defensible positions, § 2254(d)(1) requires the federal court to deny the petition." *Mendiola v. Schomig*, 224 F.3d 589, 591-92 (7th Cir. 2000).   As the above discussion reflects, the state court of appeals did both, by applying the *Strickland* test seriously and coming to the eminently reasonable conclusion that Thompson's claim of prejudice was based on little more than speculation.   Federal habeas relief is rare, reserved for "those relatively uncommon cases in which state courts veer well outside the channels of reasonable decision–making about federal constitutional claims."   *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc).   This is not such a case.   Accordingly, Thompson is not entitled to federal habeas relief on this claim that trial counsel failed to pursue the lack of urine sufficiently.

II.   **Impeaching the Source of the Other-Acts Evidence With J.K.'s Prior Convictions**

While Thompson raised this second claim of ineffective assistance in his state court postconviction motion, he failed to pursue it on appeal.   As a result, he has procedurally defaulted his right to pursue this claim in federal court under *O'Sullivan*.   526 U.S. at 848. Nor does Thompson suggest in his petition that he can meet either of the two exceptions to this default under *Steward*.   80 F.3d at 1211-12.   Nevertheless, given this court's assurances in prior orders that it would fully and fairly review the petition, even if Thompson did not submit a brief in support (*see* Order, March 13, 2020 (dkt. # 44) 2-3), and claimed inability to litigate this case on his own, the court will overlook this default and consider the merits of Thompson's second claim as well.   Still, Thompson's claim fails under the second prong of the *Strickland* test.

In particular, having read the trial transcripts in their entirety, this court cannot conclude that the outcome was reasonably likely to have been different had the jury been told about J.K.'s three convictions.   As an initial matter, the jury was aware that the victim, S.S., had two prior convictions herself, yet still credited her story, which suggests that evidence that J.K. had three convictions would have had little impact, especially when defendant Thompson had *five* prior convictions himself.   Indeed, for this reason, any attempt by defense counsel to emphasize J.K.'s prior convictions as a factor undermining her credibility would simultaneously undermine Thompson's credibility.   At most, the jury would merely have been advised that J.K. had three convictions, and as likely reinforced his profiling women down on their luck as much or more than impeach J.K.'s

testimony.   Given the totality of the evidence against Thompson, this was not likely to have affected the outcome.

Moreover, even without J.K.'s testimony, the jury had ample reason to believe S.S.'s account over Thompson's based on:   (1) her injuries as documented the following day by the SANE nurse; (2) Thompson's strained explanation of why S.S. accompanied him back to the house; (3) his admission to meeting J.K. on the street near the same bar and promising money so that she would accompany him back to an abandoned house; (4) the unlikely story that S.S. would have had a consensual sexual encounter with Thompson in the basement, which was described as "a disgusting, nasty place" (Hrg. Tr. (dkt. # 22-23) 45-46); (5) S.S.'s disoriented and agitated state after the encounter; and (6) Thompson's damaging admission that he liked to go to the bar where he met S.S. to "meet up" with women.   Under any reasonable review of this evidence, S.S.'s version of events was far more likely than Thompson's.

Finally, S.S.'s testimony established all of the elements of the offenses with which Thompson was charged.   For all these reasons, therefore, there is *no* factual or legal basis to conclude that the jury would have been "reasonably likely to acquit" Thompson on any charge because J.K. had three convictions.   Thus, Thompson's claim for ineffective assistance of counsel under *Strickland* also fails on this second ground even ignoring his obvious procedural default.

### III.    Pretrial Motion for *In Camera* Review of S.S.'s Mental Health Records

After Thompson was charged, he brought a pretrial motion for an *in camera* review of S.S.'s mental health records under *State v. Shiffra,* 175 Wis. 2d 600, 499 N.W. 2d 719 (Ct. App. 1993), based on S.S.'s statement at an August 2012 court appearance that she was being treated for depression and has a "borderline personality disorder."   Under *Shiffra* and *State v. Green*, 2002 WI 68, 253 Wis.2d 356, 646 N.W.2d 298, a criminal defendant in Wisconsin has the burden of making a fact-specific showing of "a 'reasonable likelihood' that the records will contain probative, noncumulative evidence necessary to the determination of the defendant's guilt or innocence[.]"   *Thompson*, 2016 WI App 75, ¶ 34 (citing *Green*, 2002 WI 68, ¶¶ 33-34.)   Thompson supported his motion with general information about symptoms of borderline personality disorder as described by the National Institute of Mental Health.   The circuit court concluded that this submission fell short of the required showing for an *in camera* review.

On appeal, however, Thompson's counsel chose not to challenge the *circuit court's* ruling on the *Shiffra* motion, arguing only that his trial counsel's *Shiffra* motion was deficient because it omitted reasons why an *in camera* review was needed.   Regardless, the Wisconsin Court of Appeals rejected this claim, finding that "Thompson has failed to demonstrate prejudice [under *Strickland*] because, even with that information added, an *in camera* review of S.S.'s mental health records was not required."   *State v. Thompson*, 2016 WI App 75, ¶ 45.   Thompson reasserts this same claim of ineffective assistance in his habeas petition, which again must fail.   First, by failing to include this third aspect of his *Strickland* claim in his petition for review with the Wisconsin Supreme Court, Thompson

has again procedurally defaulted it.   Second, even if this default were overlooked, his claim also fails on its merits.

Although not developed in this court, perhaps in recognition of his default in state court, the Wisconsin Court of Appeals reviewed the arguments Thompson raised as to this third claim of ineffective assistance, and persuasively concluded that the additional information he presented on appeal amounted to "mere speculation or conjecture" as to what information may have been in S.S.'s mental health records.   Thus, the "new" evidence that Thompson presented on appeal merely consisted of more, general information about borderline personality disorder as described in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–V).   Specifically, Thompson pointed out that the DSM-V explained people with this disorder tend to "spontaneously idealize potential caregivers or lovers, and special sensitivity to interpersonal stresses, real or imagined fears of abandonment, which can lead to anger and enduring bitterness," and "some" may hallucinate during times of stress.   *Thompson*, 2016 WI App 75, ¶ 43.

As the court of appeals pointed out, however, the mere fact that some unspecified number of persons with borderline personality disorder *might* hallucinate fails to suggest that S.S. did so, particularly when a jury had a chance to consider S.S.'s testimony as to what happened, along with Thompson's, and all the other evidence presented.   In any case, Thompson's *theory* that "hallucinating" meant S.S. may have misinterpreted consensual sex as forcible rape does not square with Thompson's own description of S.S.'s behavior during the encounter, nor with her physical injuries described in the SANE's exam.   *Id*. at ¶ 42 (noting that "if S.S. hallucinated that Thompson was forcing himself on

her sexually, her response would have been very different than what Thompson described, which was that S.S. initiated sex by rubbing and kissing him and then had consensual sexual intercourse with him."). Likewise, Thompson speculates that S.S.'s borderline personality disorder might have caused her to "idealize" Thompson, perceive him as a lover, and initiate sex with him, but then become angry after perceiving his "impending abandonment" of her. As the Wisconsin Court of Appeals observed, that scenario is not only highly speculative, but it, too, neither fits Thompson's version of events at trial nor the physical evidence. *Id*. at ¶ 43.

In short, this court agrees with the Wisconsin Court of Appeals' conclusion that Thompson's third claim amounts to nothing more than sheer speculation about what information might have been helpful to the defense had he been given access to S.S.'s mental health records and, therefore, lacks any evidence of prejudice by trial counsel's failure to include that information in support of a *Shiffra* motion. Accordingly, even setting his default of this claim aside, Thompson is not entitled to relief on his claim of ineffective assistance of counsel in federal court having failed to show actual prejudice.

## IV.  Certificate of Appealability

The last issue the court must consider is whether to issue a certificate of appealability of this final order adverse to the petitioner. *See* 28 U.S.C. § 2253(c)(2); Rule 11 of the Rules Governing Section 2254 Cases. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). To make

a substantial showing, petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotation omitted).   Here, Thompson has fallen far short of showing any arguable ineffective assistance of counsel, much less the denial of a constitutional right.   Even if his trial counsel would have taken all the actions Thompson now claims, there is every reason to believe that the outcome at trial would have been the same.   Because reasonable jurists reviewing this record would not debate this conclusion, particularly in light of the substantial deference due the Wisconsin Courts' similar view, Thompson is not entitled to a certificate of appealability.

ORDER

IT IS ORDERED that Rodell Thompson's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is DENIED and his petition is DISMISSED with prejudice.   No certificate of appealability shall issue.

Entered this 8th day of March, 2021.

BY THE COURT:

/s/
_____

WILLIAM M. CONLEY
District Judge